FILED

07/07/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0252

DA 23-0252

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 143

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

KEVIN EARL MORRIS,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. DDC-20-103
Honorable John W. Parker, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Tammy A. Hinderman, Appellate Defender Division Administrator, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant Attorney General, Helena, Montana

          Joshua A. Racki, Cascade County Attorney, Susan Weber, Amanda Lofink, Deputy County Attorneys, Great Falls, Montana

Submitted on Briefs:  August 27, 2025

Decided:  July 7, 2026

Filed:

_____
Clerk

Chief Justice Cory J. Swanson delivered the Opinion of the Court.

¶1    On June 11, 2021, Kevin Earl Morris was found guilty of one count of Sexual Intercourse Without Consent and one count of Solicitation of Tampering with Physical Evidence. Morris now appeals the Eighth Judicial District Court's rulings on rape shield evidence and a discovery sanction. Morris also appeals the District Court's imposed probation conditions concerning his contact with minors. We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.

¶2    We restate the issues on appeal as follows:

*Issue One: Whether the District Court correctly applied § 45-5-511, MCA, to preclude Morris from presenting evidence related to the victim's past sexual history and past reports of rape.*

*Issue Two: Whether the District Court correctly imposed probation conditions that restricted Morris' contact with minors.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3    In December 2019, JB and his wife BB, the victim in this case, invited Morris to rent a room in their apartment. JB worked full time during the day, and BB worked full time at night as a certified nursing assistant (CNA). Morris also worked full time as a CNA. Morris lived with JB and BB along with their children for a span of several months. On February 7, 2020, BB informed the police that Morris raped her the day before. During the investigation, Morris provided a recorded interview to law enforcement, in which he admitted to having intercourse with BB, but claimed he awoke to BB having sex with him. The State charged Morris with Sexual Intercourse Without Consent and Solicitation of

Tampering with Evidence, a felony in violation of §§ 45-5-503(1), and 45-7-207(1)(a), MCA.

**Pretrial Proceedings**

¶4      On March 25, 2021, the State filed a motion in limine, requesting any § 45-5-511(2), MCA, rape shield evidence to be excluded unless presented to the court outside the jury's presence. The motion specifically sought to exclude: "the victim's prior instance of rape, past interactions with other men, and part of her text message to Defendant the next day . . . [and] [a]ny evidence, testimony, or discussion of the victim's past as indicated."

¶5      Morris requested a hearing wherein he sought to establish, based on two text messages, that BB had previously made a false allegation of rape. The first text was from JB to Morris and said, "I Don't' [sic] trust her because she has given me reasons not to. She is very manipulative and sneaky and will take a lie to the grave." The second text was from BB to Morris that stated, "That whole situation literally made me flash back to the first time I was raped." The District Court declined to hold a hearing on the issue.

¶6      Three days before trial, the District Court granted the State's motion in limine and found, "Defendant here does not even offer specifics to indicate a prior accusation was made . . . [and] Defendant has made groundless assertions that fail to satisfy the standards established in Montana Law." The court also prohibited the parties from discussing prior false accusations of rape during voir dire and opening statements and precluded the introduction of rape shield evidence unless it was first brought to the court's attention outside the jury's presence.

3

**Trial**

¶7     Prior to trial, the State stipulated it had no objection to the introduction of the above text message from JB to Morris.  Based on the stipulation, the District Court allowed both parties to reference the text.  The State also informed the court of its intention to reference the above text from BB to Morris, but it argued such a reference would not open the door to the merits of a prior rape as it was merely transactional and provided context for BB's state of mind.  Morris argued the court should either redact the statement about the prior rape from the text or rule that it opened the door to evidence about the accusation's veracity. The court reserved ruling until the issue arose during trial.

¶8     During trial, BB testified about the events of February 6, 2020.  Around 11:00 a.m., Morris was sitting in his room with the door open watching a movie.  BB was the only other person in the house.  BB knocked on Morris's door to speak with him about traveling CNA work and gas money.  BB then entered Morris's room and sat on the side of his bed "about an arm's length" from Morris.  Eventually, Morris asked if he could give BB a massage.  She moved away while trying to answer his questions about traveling CNA work. Unprompted, Morris repositioned himself behind BB and began massaging her shoulders.

¶9     During the massage, Morris grabbed BB and removed her shirt and undergarments. BB tried to stand up, but Morris then pulled down her pants and his own.  BB attempted to excuse herself from the situation by telling Morris she had to shower and pick up her daughters from daycare.

¶10     At this time, BB was facing Morris and tried to step away, but Morris pulled her on top of him.  BB repeatedly told Morris "no," that they should stop, and that she "wasn't

4

having sex with him." Morris responded, "Well, don't then," and holding BB with one arm, inserted his penis into her vagina. BB was unable to move because "[h]e had his arms wrapped around me, and I just froze." When BB tried to get up Morris pulled her down and said, "I'm already there." After Morris ejaculated, he "looked at me and said 'I'm done,' so I got up."

¶11 BB left the room and went to take a shower. While in the bathroom, BB texted her ex-husband, Johnnie Moore (Moore). Moore later testified that BB told him Morris pulled her on top of him and raped her. She was confused and needed advice on how to tell JB. Moore encouraged BB to go to the police or the hospital. After texting Moore, BB showered and cried, then left to pick up her children.

¶12 BB did not immediately tell JB because she was nervous he might not believe her, nor did she immediately go to the police because she thought she was "the wrong color . . . to be a rape victim."[1] BB did, however, exchange texts with her coworker, Ashley Hall-Hand (Hall-Hand) concerning the assault.

¶13 The next morning BB sent a text to Morris while he was at work:

> So what happened yesterday will never happen again. It wasn't enjoyable. I did not want to have sex with you. I kept trying to get out of the room. I understand you want someone to have sex with, but I am not that person. That whole situation literally made me flash back to the first time I was raped. Our interactions will be very limited. I just need my debit card back and rent/gas money from you when you get paid. I hope you get an apartment on the 1st.

---

[1] BB later testified at trial she grew up in Louisiana and her experience taught her, as a woman of color, not to trust law enforcement.

At first, Morris tried to call BB, who did not respond. A few minutes later, Morris texted her: "Never. No disrespect. I have too much respect for you." BB replied, "I don't want to talk. I just need distance. Yesterday put me in a really fucked up place mentally, so please just leave me alone. I won't tell J[B], if that's what you're concerned about." Morris again tried to call BB, but she did not answer. Several hours later, Morris texted BB, "I have all the respect in the world for you" and "Please remove all texts, please."

¶14 The night of the incident, BB discussed the situation with JB in veiled terms; telling it as if she read a Facebook post about a woman who was assaulted by her roommate. She then asked JB what his thoughts were to "see if it would be safe enough for me to tell him." The next day, JB asked BB if Morris had assaulted her. BB then told him about the incident. JB told BB she needed to go to the police; however, BB did not want to because she did not trust the justice system. On cross-examination at trial, Morris confronted BB with JB's statement that if she did not report the rape to law enforcement, he would believe she had cheated on him. JB attempted to report the rape to the police on his own, but they informed him BB needed to be there to report it. BB later accompanied JB to the police station and then went to the hospital for a sexual assault examination.

¶15 The day after the incident, Morris agreed to be interviewed at the police department. At trial, the State played a slightly redacted version of his recorded interview for the jury. According to Morris, he was off work on February 6 for a doctor's appointment. When he arrived home from his appointment, he spoke with BB about traveling CNA work, took his medicine, and went to sleep. When he awoke, BB was on top of him and having sex with him. After realizing what was happening, Morris told BB "get off me," that he is "not that

6

kind of man," and that he "won't say nothing to him [JB] but don't ever do that to me again."

¶16    During the second day of trial after BB testified on direct exam, Morris requested to discuss the propriety of a follow-up question with the court outside the jury's presence. Morris intended to ask BB about her prior rape and "any other infidelities or cheating that [BB] may have committed while she was married to . . . Moore."  He argued the State opened the door to this line of inquiry when it solicited BB's testimony that she had first told Moore "[b]ecause there was a situation prior that I had talked to him about."  On cross-examination, defense counsel asked without objection, "And that was a situation that caused you to believe that you might not be believed, is that correct?" to which BB answered yes.  BB had not explained what the "situation" was between her and Moore.

¶17    At sidebar, Morris argued this testimony should permit him to ask BB about her prior rape referenced in the text message to Morris, but "the defense is more interested in any other infidelities or cheating that [BB] may have committed while she was married to Mr. Moore."  Morris asserted this was relevant because BB's "credibility has been put squarely at the forefront of this case."  Referencing JB's statement that if BB did not report Morris's rape to the police, JB would think BB was cheating on him (which the jury had already heard), Morris stated, "So part of our theory, Your Honor, is that infidelity led to the break up of [BB's] prior marriage with Johnnie Moore."  Morris then asserted that if she had cheated on JB, she would have a motive to claim Morris had raped her to avoid another divorce.

7

¶18 Morris provided no evidence to substantiate the theory of infidelity but instead theorized BB accused Morris of rape to prevent JB from thinking she cheated on him. Because Morris never made an offer of proof, the court reasoned the issue "remains merely speculative and unsupported." The State, apparently unaware of Moore's statement to Morris's investigator discussed below, responded that BB had been raped when she was dating Moore, she had not cheated on him, and there was no evidence of a false rape accusation. Morris attempted again, claiming "the facts of it could establish a pattern of behavior there." The District Court ruled Morris could ask minimal questions about the previous time when BB was raped, but there had been no factual foundation offered to inquire into speculative claims of BB's infidelity vis-á-vis Moore. The court further advised Morris was potentially trying to introduce BB's sexual conduct to assert a character trait, which may be inadmissible anyway.

¶19 On the third day of trial, the District Court allowed the State to redact portions of a video of Morris's police interview. The redacted portions contained Morris's allegations about JB and BB cheating on one another, threesomes at BB's work, and JB's distrust of BB. Morris objected to the redactions, but the court found the allegations to be unsupported, speculative, and irrelevant. However, the court noted it would reconsider if Morris made an offer of proof to substantiate the cheating allegations. Morris never made an offer of proof. During this colloquy, it again became apparent the State was unaware of Moore's previous statement to Morris.

¶20 Near the end of the third day of trial, the State informed the court that Morris intended to make an offer of proof concerning BB's alleged infidelity to Moore based on

8

Morris's investigator's notes. Morris disclosed the investigator interviewed Moore nearly a year before trial and wrote notes that Moore stated he and BB "had some problems during their marriage, including infidelity, both sides, that caused the marriage to be terminated."[2] Morris sought leave of the court to ask Moore about these statements, and needed a ruling immediately because Moore was scheduled to fly out of Great Falls that evening and had an immovable conflict that would not allow him to extend his trial testimony to the next day.

¶21 The State objected on the initial grounds that Moore's statement had never been disclosed to the State. The court inquired Morris why the statement should not be prohibited on that basis alone. Morris responded that investigator's notes are covered under attorney work product, and therefore not discoverable. Secondly, the statement did not become relevant until Moore testified on direct exam that he found BB to be a trustworthy person. Up until that point, Moore's statement was barred by the court's pretrial ruling on rape shield evidence, so it did not have to be disclosed, unless developments at trial rendered it admissible.

¶22 The District Court ruled that Morris should have disclosed Moore's statement to the State, and a pending pretrial motion on admissibility does not negate a party's discovery obligations. The District Court explained that to meet a threshold of admissibility on Morris's theory to get around the rape shield, he had to offer evidence beyond speculation for the court to consider in its ruling:

---

[2] This is a quote of Morris's offer, not purported to be an exact quote from Moore. The exact quote from Moore was never provided in the record.

You had that report since July of last year, though. I mean, I've told you at least four times you need an offer of proof to get the relief you want under rape shield. And now I'm hearing you had it in your back pocket all along and you haven't even mentioned it. Please tell me what I'm missing here.

The court ruled Morris could not cross-examine Moore based on the undisclosed notes and issued a discovery sanction pursuant to § 46-15-329(4), MCA, prohibiting their introduction.

¶23 Notwithstanding this ruling, Morris was permitted to cross-examine Moore on BB's credibility about her prior rape allegation. On direct exam, Moore discussed a Facebook message from BB, in which she asked, "Did you believe me when I told you I had been raped"—referring to an incident that occurred when the two were still in a relationship. On cross-examination, Moore provided his Facebook message answer to BB: "At that time, no I did not believe you." He then explained he did not believe BB because at the time of her initial rape disclosure, Moore had believed all rape victims had to fight back for the rape allegations to be believable. If they "gave up" it wasn't really rape. Moore explained he now had a different mindset.

¶24 The issues arose again during Morris's cross-examination of JB on the fourth day of trial. Morris attempted to question JB about BB's alleged prior infidelity during her marriage with Moore. The court sustained the State's objection on grounds of hearsay and prejudice.

¶25 The jury found Morris guilty of one count of Sexual Intercourse Without Consent and one count of Solicitation of Tampering with Physical Evidence. During sentencing, Morris objected to two probation conditions in his presentence investigation report that

restricted his contact with minors. The first prevented Morris from associating with "any individual under the age of 18 unless accompanied by an appropriately trained, responsible adult," and the second prevented him from "frequent[ing] places where children congregate unless accompanied by an appropriately trained, responsible adult." Morris argued that because his convictions were unrelated to minors, there was no sufficient nexus to prohibit his contact with them. There were also several other conditions that limited Morris's contact with minors, yet Morris failed to object to them. On March 3, 2023, the District Court sentenced Morris to the Montana Department of Corrections for a 15-year term with 10 years suspended and to a concurrent 10-year term with all-time suspended. The court imposed all recommended conditions except certain financial terms.

## STANDARD OF REVIEW

¶26 District court rulings of law, whether concerning a rule of evidence, statute, or the Constitution, are reviewed de novo for correctness. *State v. Santoro*, 2024 MT 136, ¶ 15, 417 Mont. 92, 551 P.3d 822. This Court reviews rulings on evidence for an abuse of discretion, "which occurs when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *State v. Daffin*, 2017 MT 76, ¶ 12, 387 Mont. 154, 392 P.3d 150. Discretionary decisions, including the imposition of discovery sanctions or the imposition of reasonable conditions on a sentence, are reviewed for an abuse of discretion. *State v. DeMary*, 2003 MT 307, ¶ 10, 318 Mont. 200, 79 P.3d 817 ("We review a district court's imposition of sanctions pursuant to § 46-14-329, MCA, for an abuse of discretion"); *State v. Nauman*, 2014 MT

11

248, ¶ 8, 376 Mont. 326, 334 P.3d 368 ("We review the reasonableness of conditions or restrictions imposed on a sentence for abuse of discretion.").

**DISCUSSION**

¶27 *Issue One: Whether the District Court correctly applied § 45-5-511, MCA, to preclude Morris from presenting evidence related to the victim's past sexual history and past reports of rape.*

¶28 Morris argues the court abused its discretion and violated his rights to present a complete defense and confront the witnesses against him by excluding evidence of the notes collected by his investigator and prohibiting him from conducting cross-examinations about BB's prior rape report and alleged infidelity during her prior marriage. The State responds the District Court properly balanced the defendant's right to present a defense with the statutory exclusion of speculative rape shield evidence.

¶29 Montana's rape shield statute generally precludes "[e]vidence concerning the sexual conduct of the victim" from being admitted in a criminal trial. Section 45-5-511(2), MCA. Montana's statute "is designed to prevent the trial of the charge against the defendant from becoming a trial of the victim's prior sexual conduct." *State v. Colburn*, 2016 MT 41, ¶ 22, 382 Mont. 223, 366 P.3d 258 (citing *State v. Higley*, 190 Mont. 412, 422, 621 P.2d 1043, 1050–51 (1980)).

¶30 We have recognized three exceptions to this exclusion. The first two are contained within the statute: evidence of the alleged "victim's past sexual conduct with the [alleged] offender," or "specific instances of the [alleged] victim's sexual activity to show the origin of semen, pregnancy, or disease" relevant to the case. Section 45-5-511(2), MCA. The third exception applies if the evidence is "narrowed to the issue of the complaining witness'

12

veracity" then "evidence of similar sexual offenses claimed to have been committed against the victim by other individuals is admissible *if the offenses were proven or admitted to be false.*" *State ex rel. Mazurek v. Fourth Judicial Dist.*, 277 Mont. 349, 354, 356, 922 P.2d 474, 478–79 (1996) (emphasis in original, quotations and citations omitted). While the rape shield exclusion protects alleged victims from being subject "to harassing or irrelevant questions concerning their past sexual behavior," *State v. Awbery*, 2016 MT 48, ¶ 17, 382 Mont. 334, 367 P.3d 346 (citations omitted), these three exceptions uphold the defendant's right to present a complete defense by offering evidence which helps the fact finder weigh the veracity of competing claims and reach the ultimate issue in the prosecution.

¶31 The rape shield statute is not an *absolute* bar of evidence, nor can it "be applied to exclude evidence arbitrarily or mechanistically." *Colburn*, ¶ 25. Rather, where conflict arises between the rape shield statute and the defendant's constitutional rights to confront his accuser and present a complete defense, this Court balances the rights of the victim with those of the defendant. *Colburn*, ¶ 25. In doing so, the trial court must ensure:

> the defendant's proffered evidence is not merely speculative or unsupported. . . . the proffered evidence is relevant and probative under M. R. Evid. 401 and 402, . . . the evidence is [not] merely cumulative of other admissible evidence, and . . . the probative value of the evidence is [not] outweighed by its prejudicial effect under M. R. Evid. 403.

*State v. Twardoski*, 2021 MT 179, ¶ 27, 405 Mont. 43, 491 P.3d 711 (internal quotations omitted).

¶32 We now review each of Morris's attempts to introduce evidence of BB's prior sexual conduct for an abuse of discretion.

13

**Prior Allegations of Rape**

¶33 An alleged victim's prior allegations of rape may be admissible if they are demonstrated to be false according to the requirements and procedure exhibited in *Mazurek*. In *Mazurek*, we held evidence of prior false rape accusations are admissible if (1) counsel first files written notice of intent to use such evidence, and (2) after a hearing outside the presence of the jury, the court determines "there is sufficient evidence to support the contention that the allegation was false," then such evidence can be admitted. *Mazurek*, 277 Mont. at 357–58, 922 P.2d at 479–80. Yet, for the district court to determine the evidence is admissible, "the defendant must establish, by a preponderance of the evidence, that (1) the accusation or accusations were in fact made; (2) that the accusation or accusations were in fact false; and (3) that the evidence is more probative than prejudicial." *Mazurek*, 277 Mont. at 358, 922 P.2d at 480 (internal quotations omitted).

¶34 Several months before trial, pursuant to *Mazurek* and § 45-5-511(2)–(3), MCA, the State moved the court to generally preclude references to BB's prior sexual conduct without prior presentation to the court outside the jury's presence. In response, Morris requested a *Mazurek* hearing concerning prior rape allegations by BB. In his brief, Morris argued two text messages constitute "very strong evidence of a false accusation." The first text, from BB to Morris, stated, "That whole situation literally made me flash back to the first time I was raped." The second text, from JB to Morris expressed a level of distrust in BB, calling her "manipulative and sneaky."

¶35 The District Court granted the State's motion to preclude any inquiry into BB's prior sexual conduct, including reference in voir dire or opening statements, to a previous

14

occasion when BB alleged she was raped (not by Morris), absent inquiry with the court outside the jury's presence. The court did not grant Morris's request for a *Mazurek* hearing because he "does not even offer specifics to indicate a prior accusation was made. . . . [and] has made groundless assertions that fail to satisfy the standards established in Montana law." Morris argues the court erroneously denied him the opportunity of a *Mazurek* hearing at that time. He contends the court's requirement that he provide evidence to support his false allegation claim *before* he is entitled to a hearing is "a classic case of putting the cart before the horse." Instead, he claims, "this Court's precedent '*requires* that the district court conduct a [Mazurek] hearing.'"

¶36 Our holding in *Mazurek* does not suggest "that a hearing can be used to examine the complaining witness on the stand if there is no evidence that the witness has made a prior false allegation." *State v. Ring*, 2014 MT 49, ¶ 19, 374 Mont. 109, 321 P.3d 800. Nor does our holding in *Mazurek* or *Anderson* require the court to allow questioning of the victim "in order to locate potential evidence of past accusations." *Ring*, ¶ 19.

¶37 Here, Morris did not offer any evidence that BB ever made a prior false allegation of rape but instead sought to examine her merely based on her claim she had previously experienced rape. Morris never presented evidence that the prior incident was reported, adjudicated, or the accused was ever named. Without at least a scintilla of context, a prior allegation of rape cannot be proven false. A *Mazurek* hearing is not a discovery tool used to gather evidence, but a tool to discern the admissibility of existing evidence regarding false rape allegations. The District Court did not abuse its discretion in denying a *Mazurek* hearing where there was no evidence to support the claim BB made a prior false allegation.

¶38     However, that is not the end of the issue.  After receiving a favorable ruling, excluding BB's text message referencing her previous sufferance of rape and excluding JB's text message calling BB "manipulative and sneaky" and alleging she "will take a lie to the grave," the State changed course and stipulated to the introduction of both text messages.  Morris then claimed the State had opened the door to questions about BB's prior rape experience.  The court held the door was not open to allege BB's report of having suffered a prior rape was a false report, absent an offer of proof from the defendant.  Morris never made an offer of proof, so the court never allowed him to question BB on the subject.  Morris now argues the State opened the door to questions concerning the potential falsity of BB's claim she had previously been raped, and the State utilized the statement to bolster the veracity of her claims and her credibility as a "rape survivor."  The State counters that the statement of her past rape was merely transactional and therefore admissible.

¶39     The District Court did not abuse its discretion in handling this issue.  Although a party can open the door to a topic by offering otherwise "off limits" evidence, "[d]istrict courts have broad discretion to determine the extent to which a party may respond once the other party opens the door."  *State v. Guill*, 2010 MT 69, ¶ 39, 355 Mont. 490, 228 P.3d 1152.  In the interest of the rape shield statute's prohibitions and particularly the interest of preventing the trial from becoming a trial of past rape experienced by the alleged victim—but unrelated, unreported, and unadjudicated—the court correctly required an offer of proof before swinging the door open to all questions on the issue.

¶40     Nevertheless, the court eventually allowed Morris to question Moore about the credibility of BB's prior rape—which allegedly occurred while the two were dating.

16

Morris even elicited testimony from Moore that he did not believe the prior allegation at the time, before explaining this doubt was based upon his own misconceptions of sexual violence, rather than BB's credibility. Although Morris never presented sufficient evidence to warrant an inquiry into the so-called false rape claim under *Mazurek*, he was permitted to question BB's credibility regarding the prior event. Morris cannot show prejudice from this denial. We hold the District Court did not abuse its discretion.

**Alleged Infidelity**

¶41 Although the prior rape issue was repeatedly discussed during trial, Morris informed the District Court "the defense is more interested in any other infidelities or cheating that [BB] may have committed while she was married to Mr. Moore." Before trial when responding to the State's motion in limine, and twice during the trial, Morris had an opportunity to provide the court sufficient evidence to join the matter for a ruling to overcome the rape shield exclusion. Yet he failed to provide any evidence, and the District Court noted without an offer of proof from Morris, "[i]t remains merely speculative and unsupported."

¶42 Morris sought the admission of the evidence alleging BB had previously been unfaithful to her ex-husband, as well as evidence she and JB had both engaged in sexual conduct outside of their marriage. Morris's offers in this regard were purportedly to rebut BB's character for truthfulness, but they were actually to allege BB's propensity to engage in sexual conduct with other men. As Morris stated at sidebar, "the facts of it could establish a pattern of behavior there." In response to that statement, the District Court noted such a purpose was likely not admissible, which indeed it is not. "Rape shield laws

17

evolved from society's recognition that a rape victim's prior sexual history is irrelevant to issues of consent *or the victim's propensity for truthfulness.*" *Colburn*, ¶ 22 (emphasis added) (citations omitted); *Awbery*, ¶ 17 (same).

¶43 Evidence of prior infidelity is classic rape shield evidence which § 45-5-511(2), MCA, seeks to preclude, and does not fall within the recognized exceptions to the rape shield statute: (1) "past sexual conduct with the offender"; (2) "specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease . . . at issue in the prosecution"; or (3) prior false allegations of similar sexual offenses. *Mazurek*, 277 Mont. at 354, 356, 922 P.2d at 478–79; § 45-5-511(2), MCA. Nevertheless, if the rape shield statute seems to conflict with the defendant's constitutional rights, this Court balances the alleged victim's and defendant's rights and ensures the evidence (1) is not merely speculative or unsupported, (2) is relevant and probative, (3) is not merely cumulative of other admissible evidence, and (4) is not more prejudicial than probative. *Twardoski*, ¶ 27 (citations omitted).

¶44 Morris argues the alleged victim's prior sexual history, specifically alleged infidelity, is admissible when the evidence is "related to the complainant's motive to fabricate." He relies on *Twardoski* and *Olden v. Kentucky*, 488 U.S. 227, 109 S. Ct. 480 (1988), but neither support his theory.

¶45 In *Olden*, the district court prohibited Olden from presenting evidence of the victim's current living arrangement—with a man other than her husband (Russell)—to support a theory the victim concocted a rape allegation to dispel any of Russel's suspicions of the victim's association with Olden. *Olden*, 488 U.S. at 229–30, 109 S. Ct. at 482. The

18

Kentucky Court of Appeals held the evidence was admissible under that state's rape shield law but excluded it because the evidence's probative value was outweighed by the danger of unfair prejudice due to the alleged victim's inter-racial relationship with a man who was not her husband. *Olden*, 488 U.S. at 230, 109 S. Ct. at 482. The United States Supreme Court reversed the ruling limiting Olden's cross-examination, holding the Confrontation Clause of the Sixth Amendment requires a defendant have the right to cross-examine witnesses as to potential bias. *Olden*, 488 U.S. at 231–32, 109 S. Ct. at 482–83. But even *Olden* qualified that confrontation right to hold "a trial court may, of course, impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, to take account of such factors as 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant.'" *Olden*, 488 U.S. at 232, 109 S. Ct. at 483 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986)).

¶46 As applied to this case, Morris already obtained what *Olden* requires. The jury was informed that JB was suspicious of BB's fidelity and credibility, and Morris was allowed to inquire into BB's motive to fabricate a rape allegation against him to allay JB's concern she may have cheated. The "reasonable limit" on Morris's assertion of BB's motive to fabricate was the evidence and rights balancing test we require when considering possible rape shield evidence. We have specifically noted the "constitution does not require a blanket exception to rape shield statutes for all evidence related to *motive to fabricate*." *State v. Johnson*, 1998 MT 107, ¶ 24, 288 Mont. 513, 958 P.2d 1182 (emphasis added). Rather, any evidence challenging the complainant's motive or veracity in this arena must

19

be analyzed through the balancing analysis the District Court conducted here. "Speculative or unsupported allegations are insufficient to tip the scales in favor of a defendant's right to present a defense and against the victim's rights under the rape shield statute." *Johnson*, ¶ 24. Morris sought to introduce speculative allegations that BB was unfaithful to Moore—years before—to buttress his motive and untruthfulness claim. Such unrelated and unsupported evidence is properly excluded without denying Morris the opportunity to confront BB's testimony, as he did in this trial.

¶47 Our holding in *Twardoski* illustrates the proper balancing when rape shield evidence is admissible. *Twardoski*, ¶¶ 27–30 (finding the rape shield evidence "was neither speculative nor unsupported," it was "relevant and admissible," and was more probative than prejudicial). The same goes for *Colburn*, which Morris argues also indicates an instance wherein rape shield evidence was admissible to rebut specific evidence presented in the State's case-in-chief. In *Colburn*, we applied the rights balancing analysis and did not expand a blanket exception. *Colburn*, ¶ 25.

¶48 Morris was intending to offer unsubstantiated evidence of BB's alleged infidelity to propose a "pattern of behavior" of sexual conduct with men outside of her marriage. This is the classic "loose woman" defense to a rape case, constructed to introduce an alleged victim's unrelated sexual conduct and thereby smear the veracity of her testimony. The District Court correctly prevented defense counsel from engaging in such an exercise.

**Discovery Sanction**

¶49 On day three of trial, Morris finally produced evidence of BB's alleged infidelity which he argued was relevant to the charge. The evidence was contained in the notes of

20

his defense investigator, who interviewed Moore almost a year before trial, and wrote down Moore's statements from the interview. It is undisputed Morris never disclosed the notes or Moore's statement to the State before trial, nor did they disclose Moore's statement as an offer of proof during multiple previous discussions with the court during trial. The District Court was understandably surprised when Morris waited until Moore's testimony near the end of trial, shortly before he had to depart Montana on a flight, to disclose the statement and seek leave to ask Moore about it.[3] The District Court barred Morris from raising the notes due to his failure to disclose it as required under § 46-15-323(6), MCA.

¶50 Morris contends his lack of disclosure did not violate § 46-15-323(6)(a), MCA. That statute provides:

> (6) Within 30 days after the arraignment or at a later time as the court may for good cause permit, the defendant shall make available to the prosecutor for testing, examination, or reproduction:

> (a) the names, addresses, and statements of all persons, other than the defendant, whom the defendant may call as witnesses in the defense case in chief, together with their statements[.]

Morris notes § 46-15-323(6)(a), MCA, facially does not apply to statements by persons the defense does not intend to call in its case-in-chief. Morris secondly argues the investigator's notes—and Moore's statement—were not relevant as documents he "may use at trial" until the State opened the door to questioning BB's reputation for truthfulness by eliciting such testimony. Prior to that, Morris was precluded from introducing evidence

---

[3] At this point, the State had already extended his flight once and it was unfeasible to delay his flight a second time. Moore needed to catch his flight home so he could catch another flight at 8:00 a.m. the following morning to another state.

21

alleging BB was unfaithful due to the court order on rape shield and therefore had no duty to disclose the evidence to the State, citing *State v. Weitzel*, 2000 MT 86, ¶ 34, 299 Mont. 192, 998 P.2d 1154. Morris asserts he disclosed the evidence when it became relevant, preceding Moore's testimony.

¶51 The State responds that even if § 46-15-323(6)(a), MCA, does not require disclosure of Moore's statement, Morris was still required to disclose the notes by the omnibus order and § 46-15-323(6)(c), MCA, which requires the defendant to disclose "all papers, documents, photographs, and other tangible objects that the defendant may use at trial." The State also argues Morris could not withhold discovery in between the omnibus hearing and the court's evidentiary ruling immediately prior to trial, or multiple rulings during trial. This is particularly the case when the court is required to undertake a balancing test when weighing rape shield evidentiary considerations under *Twardoski*.

¶52 Morris is correct he is not required to disclose the investigator's notes containing Moore's statement under § 46-15-323(6)(a), MCA, because Moore was not a defense witness. But the State is correct Moore's statements must be disclosed pursuant to § 46-15-323(6)(c), MCA, as evidence the defendant may use at trial. We held in *State v. Miller*, 231 Mont. 497, 514, 757 P.2d 1275, 1285–86 (1988), on facts almost directly on point with this case, that a defense investigator's report, though prepared as impeachment material of the State's witnesses, was subject to disclosure under this statute. "The purpose of a criminal trial is to ascertain the truth. This aim is best realized through full disclosure and presentation of the evidence, not surprise attacks." *Miller*, 231 Mont. at 514, 757 P.2d at 1286.

¶53 We are also not persuaded by Morris's argument that Moore's statement of BB's alleged infidelity was irrelevant until the State opened the door to attacks on her credibility, thus prompting his disclosure of the report as soon as practicable under *Weitzel*. In that case, the defendant testified he did not own a handgun or a shoulder holster. *Weitzel*, ¶ 25. This testimony prompted the State to attempt to introduce pawn shop records showing Weitzel had pawned a gun and then later retrieved it. *Weitzel*, ¶ 25. Weitzel objected on the grounds of undisclosed evidence, but the district court allowed it. *Weitzel*, ¶ 25. We affirmed on appeal, because the State's evidence only became relevant after Weitzel took the stand and denied owning a gun. *Weitzel*, ¶¶ 25, 34.

¶54 In contrast here, Morris possessed Moore's statements about his marriage with BB almost a year before trial, and it was relevant as long as Morris sought to use it at trial. As the District Court noted, Morris had a long period of time when he was required to disclose this evidence before the court ruled on the rape shield motion in limine mere days before trial. Notwithstanding that ruling, Morris began the trial by accusing BB of infidelity and attempted multiple times to inquire into her sexual conduct during her marriage to Moore. And the District Court repeatedly requested an offer of proof from Morris during trial to conduct an evidentiary balancing inquiry to rule on these matters. Morris seemed determined to bring this evidence into trial and did not provide the evidence at the "earliest opportunity" as we noted in *Weitzel*.

¶55 Morris also argues the note was a part of his investigator's report, which constituted protected attorney work product not subject to disclosure under § 46-15-324(1), MCA. Section 46-1-202(32), MCA, defines work product as, "Legal research, records,

23

correspondence, reports, and memoranda, both written and oral, to the extent that they contain the opinions, theories, and conclusions of the prosecutor, defense counsel, or their staff or investigators." Morris construed the notes as "work product" because they were contained in his investigator's report, which included his opinions on the case.

¶56 Our holding in *Miller* is controlling. In *Miller*, Miller argued his investigator's report was protected work product, and not subject to disclosure. *Miller*, 231 Mont at 513, 757 P.2d at 1285. While acknowledging the value of the work product doctrine, we clarified what it is and what it is not. "At its core, the work product doctrine shelters the mental processes of an attorney, providing a privileged area within which he can analyze and prepare his client's case." *Miller*, 231 Mont. at 513, 757 P.2d at 1285 (quoting *United States v. Nobles*, 422 U.S. 225, 238, 95 S. Ct. 2160, 2170 (1975)). We agreed the protection extends to "agents of the attorney." *Miller*, 231 Mont. at 513, 757 P.2d at 1285. But the work product doctrine is not "so broad as to encompass substantial evidence." *Miller*, 231 Mont. at 513, 757 P.2d at 1285.

> There is no doubt that if an attorney uses at trial a statement he obtained and prepared in anticipation of litigation in interrogating or cross examining a witness, the full statement, even though work-product, must be produced at the demand of the other side. [Citation omitted.] By the use of the statement at trial, the attorney has waived the work-product protection, since the material in the statement has become substantive evidence.

*Miller*, 231 Mont. at 513, 757 P.2d at 1285 (quoting *State ex rel. Carkulis v. Dist. Ct.*, 229 Mont. 265, 280, 746 P.2d 604, 613–14 (1987)). Additionally, work product protection does not extend to "witness statements prepared in anticipation of litigation." *Compare State v. Pope*, 2017 MT 12, ¶ 24, 386 Mont. 194, 387 P.3d 870 (internal quotations

omitted) *with Carkulis*, 229 Mont. at 280–81, 746 P.2d at 614 ("If counsel, in representation of this client, acquires work-product objects which the defendant knows in good faith will *not* be used at trial, they are not subject to discovery under the order of the court."). Even if the investigator's report was work product and could be withheld, the witnesses' statement contained therein is substantive evidence, which must be disclosed under these circumstances.

¶57 Given Morris's failure to disclose the notes, the District Court did not abuse its discretion in precluding the evidence as a discovery sanction. Section 46-15-329, MCA, provides:

> If at any time during the course of the proceeding it is brought to the attention of the court that a party has failed to comply with any of the provisions of this part or any order issued pursuant to this part, the court may impose any sanction that it finds just under the circumstances, including but not limited to:
>
> .  .  .
>
> (4) precluding a party from calling a witness, offering evidence, or raising a defense not disclosed. . . .

¶58 In commenting on this statute, we have noted, "'Such discretion allows the court to consider the reason why disclosure was not made, whether the noncompliance was willful, the amount of prejudice to the opposing party, and any other relevant circumstances.'" *State v. Deezeeuw*, 1999 MT 331, ¶ 13, 297 Mont. 379, 992 P.2d 1276 (quoting *State v. Waters*, 228 Mont. 490, 495, 743 P.2d 617, 620 (1987)). The record indicates the District Court considered the relevant factors, including how long Morris had the information, the multiple requests for an offer of proof on this issue, and Morris's self-created crisis by

25

raising the issue late in the trial as the witness was constrained by his travel obligations. The court even gave Morris another chance to brief the court on the work product issue to no avail. We therefore hold the court did not abuse its discretion by imposing the discovery sanction.

**Hearsay**

¶59 Morris attempted to introduce evidence of BB's alleged infidelity one last time. This time, during cross-examination of JB, Morris attempted to question him about what caused BB's divorce from Moore. The court excluded the evidence on grounds of hearsay and prejudice. Morris argues JB had personal knowledge of the reasons for BB's divorce, and it was non-speculative evidence of conduct probative of BB's character for untruthfulness relevant to challenge JB's trust in BB. We disagree.

¶60 Testimony from JB concerning BB's divorce from Moore was inadmissible hearsay. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M. R. Evid. 801(c). JB was not a party to BB's prior marriage to Moore. Unless JB was a party to BB's alleged infidelity or witnessed it—which Morris did not claim in his offer of proof— JB's knowledge must have resulted from out of court statements from some other person. Morris never provided the foundation for JB's supposed first-hand knowledge and only identified JB's conversations with BB as a source for such knowledge. Additionally, Morris intended to introduce JB's testimony for the truth of the matter asserted. His offer was intended to counter JB's statement that he trusted BB by proving her sexual conduct rendered her untrustworthy, not merely to challenge JB's personal opinion of BB. During

26

a sidebar on the issue, Morris reiterated the issues in the previous marriage "show[] a pattern of behavior," and the conduct is relevant because "[i]t goes into her credibility." Because Morris did not establish any hearsay exception to whatever statements he wished to offer, the court correctly excluded this evidence.

¶61  *Issue Two: Whether the District Court correctly imposed probation conditions that restricted Morris's contact with minors.*

¶62  A court may impose any "reasonable restrictions or conditions considered necessary for rehabilitation or for the protection of the victim or society." Sections 46-18-201(4)(p), -202(1)(g), MCA.  While a district court has broad discretion in sentencing, any restrictions "must relate to rehabilitation or protection of society within the particular context of an offender's crime or the unique background, characteristics, or conduct of the offender." *State v. Zimmerman*, 2010 MT 44, ¶ 17, 355 Mont. 286, 228 P.3d 1109.  Additionally, there must be a nexus between the condition and the offense or offender.  *State v. Ashby*, 2008 MT 83, ¶ 15, 342 Mont. 187, 179 P.3d 1164.  The condition likewise should not be "overly broad or unduly punitive." *State v. Johnson*, 2023 MT 143, ¶ 7, 413 Mont. 114, 533 P.3d 335.

¶63  Morris argues several of the conditions on his sentence, which restricted his ability to be in contact with minors, have no logical nexus with his offense and are overly broad and unduly punitive.  The State counters that Morris waived his challenge to conditions 36, 38, and 44 by failing to object before the District Court.  The State also contends the District Court properly imposed conditions 28 and 29.  We agree with Morris and remand to the

District Court to readdress conditions 28, 29, 36, 38, and 44 pertaining to contact with minors.

**Conditions 28 and 29**

¶64 We first address conditions 28 and 29, to which Morris objected before the District Court. Condition 28 prevents Morris from contacting minors "unless accompanied by an appropriately trained, responsible adult who is aware of the Defendant's sexual conviction and is approved by the Probation & Parole Officer and sexual offender treatment provider." It also requires Morris to sign a "No Contact" contract and to abide by the conditions therein. Condition 29 likewise requires Morris to obtain a similarly approved "appropriately trained, responsible adult" before frequenting places where children congregate.

¶65 Morris argues neither of these conditions bears a logical nexus with himself or his convictions because his convictions did not involve children, nor has he ever harmed a child. The State argues the court properly "relied on the professional recommendation [of] the [psychosexual evaluation]" because § 46-18-111(1)(b)(i), MCA, mandates its consideration. While § 46-18-201(4), MCA, extends a district court broad discretion to impose conditional restrictions on a defendant's liberty during the suspended portion of his sentence, here we are not convinced the results of the psychosexual evaluation alone demonstrate a nexus between the crime and conditions 28 and 29. A "nexus" exists where there is some logical relationship between the condition imposed and "the particular context of an offender's crime or the unique background, characteristics, or conduct of the offender." *Zimmerman*, ¶ 17.

¶66    The requirements of §§ 46-18-111 and -207(5)(d), MCA, guides our analysis. When fashioning its sentence, the court considers the entirety of the record, and it relies upon both the recommended conditions in the presentence investigation and the therapeutic recommendation of the psychosexual evaluator for a sexual offense. Section 46-18-111(1)(a)–(b), MCA. The evaluation is performed for the benefit of both the community and the defendant, and "must include a recommendation as to treatment of the defendant in the least restrictive environment, considering the level of risk the defendant presents to the community *and the defendant's needs*." Section 46-18-111(b)(i)(A), (C), MCA (emphasis added). Even after the defendant has completed the residential sexual offender treatment program and is released on probation, Montana law mandates compliance with the continued recommendations of the sex offender therapist. Section 46-18-207(5)(d), MCA. While the analysis and recommendation of the psychosexual evaluation carries persuasive weight, here the evaluation did not provide an explanation to justify its recommendation precluding Morris from contact with minors.

¶67    We find two cases instructive for our analysis here: *State v. Mehan,* 2019 MT 100, 395 Mont. 383, 440 P.3d 25, and *State v. Melton*, 2012 MT 84, 364 Mont. 482, 276 P.3d 900. Melton was charged in Washington with rape of a fifteen-year-old while he was twenty. *Melton*, ¶¶ 4–5. Several years later, he moved to Montana but failed to notify Montana or Washington law enforcement of his changes in residency. *Melton*, ¶ 6. Montana charged Melton with failure of a sexual offender to provide notice of change of residency. *Melton*, ¶ 8. Melton entered into a plea agreement and underwent a

29

psychosexual evaluation prior to sentencing. *Melton*, ¶¶ 8, 10. As a condition of his sentence, the district court prohibited Melton from unaccompanied contact with minors or frequenting "places where children congregate." *Melton*, ¶ 15. On appeal, Melton argued the conditions precluding his contact with children had no nexus to his offense of failure to register, and his previous offense was 12 years prior without repeat violations. *Melton*, ¶ 19. This Court upheld the sentence condition because the evaluator recommended he be prohibited from contact with females under 18, for two reasons. First, Melton still indicated a non-deviant sexual interest in adolescent females (age 14 to 17). *Melton*, ¶ 14. Second, Melton demonstrated a personality trait of "denial and repression as a coping mechanism and was reluctant to admit to dysfunction or problems across many areas." *Melton*, ¶ 14. The evaluator's concern that Melton had not gained therapeutic insight into his prior offense established a sufficient nexus for this condition on his sentence. *Melton*, ¶¶ 14, 21.

¶68 In *Mehan*, the district court imposed several conditions preventing Mehan from contact with minors after being convicted for raping an unconscious woman in the parking lot of a bar. *Mehan*, ¶¶ 3–4. At sentencing, Mehan objected to those conditions, arguing there was no logical nexus between them and his rape of an adult woman. *Mehan*, ¶ 4. On appeal, this Court agreed with Mehan. *Mehan*, ¶ 9. Mehan's offense did not involve a minor and he did "not have the characteristics of a dangerous or predatory sexual offender." *Mehan*, ¶ 11. Additionally, although Mehan underwent two psychosexual evaluations, neither evaluator recommended limitations to Mehan's ability to associate with minors. *Mehan*, ¶ 11.

¶69 This case lands much closer to *Mehan* than *Melton*. Like in *Mehan*, here the victim was an adult, and there were no children present at the time of the offense. Additionally, Morris does not have a prior sexual offense or a history of failing to comply with sex offender treatment or registration. Although the rape occurred in the family home, it occurred while the children were away. Although the PSE recommended Morris be restricted from contact with minors, like in *Melton*, the evaluation does not actually contain a clinical justification for that recommendation. The PSE does not disclose any testing results which would indicate Morris is a threat to minors, contrary to the evaluator's findings upon which we relied in *Melton*. Given the absence of children involved in the crime and the lack of testing results indicating Morris might be a threat to minors, we do not find a nexus connecting the crime or Morris as an individual with conditions 28 and 29. We reverse and remand the issue of conditions 28 and 29 to the District Court for reconsideration consistent with our above analysis.

**Plain Error Review of Conditions 36, 38, and 44**

¶70 This Court generally does not review objections of improper sentence conditions raised for the first time on appeal. *See State v. Stiles*, 2008 MT 390, ¶ 14, 347 Mont. 95, 197 P.3d 966 (citing *State v. Kotwicki*, 2007 MT 17, ¶ 8, 335 Mont. 344, 151 P.3d 892). Morris, however, argues this Court should conduct plain error review because conditions 36, 38, and 44 all implicate his constitutional rights. He contends they respectively: (36) overbroadly restrict his ability to supervise children, (38) unduly restrict his ability to parent his own minor children, and (44) restrict his ability to associate with his grandchildren.

¶71 As a preliminary issue, Morris's reliance on his constitutional rights—particularly his right to parent his own children—is well received. Despite the lack of an explicit enumeration of this right in the United States and Montana Constitutions and the resulting ongoing debate of where it is grounded in the United States Constitution,[4] we have recognized the self-evident, fundamental, right to parent one's children. "Parents do have a fundamental right to parent" their children. *Planned Parenthood v. State*, 2024 MT 178, ¶ 46, 417 Mont. 457, 554 P.3d 153 (citing *Troxel*, 530 U.S. at 57, 120 S. Ct. at 2054).

¶72 Given these constitutional rights, the lack of nexus between the restrictions and the crime, and our reversal of conditions 28 and 29, we apply plain error review. "[W]e employ the plain error doctrine sparingly, on a case-by-case basis, considering the 'totality of circumstances of each case,'" whenever we review claims of error unpreserved by objection before the district court. *State v. George*, 2020 MT 56, ¶ 5, 399 Mont. 173, 459 P.3d 854 (internal quotations omitted).

> The party requesting reversal because of plain error bears the burden of firmly convincing this Court that the claimed error implicates a fundamental right and that such review is necessary to prevent a manifest miscarriage of justice or that failure to review the claim may leave unsettled the question of fundamental fairness of the proceedings or may compromise the integrity of the judicial process.

---

[4] The United States Supreme Court recognized a constitutional right to parent, but disagreed wherein that right was guaranteed. In *Troxel v. Granville*, Justice O'Conner, writing for the majority, cited the due process clause of the Fourteenth Amendment of the United States Constitution. 530 U.S. 57, 65, 120 S. Ct. 2054, 2059 (2000). Justice Thomas concurred but left open the conclusion it was guaranteed by the Privileges and Immunities Clause. *Troxel*, 530 U.S. at 80, 120 S. Ct. at 2067 (Thomas, J. concurring). Justice Scalia dissented, noting parental rights are "unalienable rights" with which "all Men . . . are endowed by their Creator," *Troxel*, 530 U.S. at 91, 120 S. Ct. at 2074 (Scalia J. dissenting) (citing THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776)), and they are "among the 'other [rights] retained by the people' which the Ninth Amendment says the Constitution's enumeration of rights 'shall not be construed to deny or disparage.'" *Troxel*, 530 U.S. at 91, 120 S. Ct. at 2074 (Scalia J. dissenting).

*George*, ¶ 5 (citations omitted).  When conducting plain error review, "we first ask if the alleged error implicates a fundamental right; we next ask if failure to review the alleged error would result in one of these [above] consequences." *State v. Hatfield*, 2018 MT 229, ¶ 15, 392 Mont. 509, 426 P.3d 569 (citations omitted).

¶73    As we have already noted, the fundamental right to parent has been implicated. Where there is no nexus to the crime and we have stricken other conditions restricting Morris's contact with minors, restriction on Morris's parental rights would "leave unsettled the question of fundamental fairness of the proceedings." *George*, ¶ 5 (citations omitted). Were we to allow these conditions to remain in place, it would cause inconsistency and confusion for Morris, his supervising probation officer, his sexual offender treatment providers, and his family, all without a justification behind the restrictions to begin with.

¶74    This holding stands in contrast to *State v. Johnson*, 2011 MT 286, ¶ 20, 362 Mont. 473, 265 P.3d 638.  There, we declined to exercise plain error review of Johnson's appellate challenge to restrictions on his contact with minors. *Johnson*, ¶ 20.  Johnson had been convicted of sexually assaulting his minor stepdaughter, thus providing a nexus to the offense and justifying infringement on his constitutional rights as a parent. *Johnson*, ¶¶ 5, 18.  Here, however, there is no such nexus between the crime and the restrictions, there is no record of a therapeutic necessity, and the unjustified restrictions infringe upon Morris's parental rights.  Finally, the imposition of the some minor-contact restrictions, paired with reversal of other conditions of the same type, would prompt a question of the fundamental fairness of the proceedings and cause confusion for Morris in fulfilling his

sexual offender treatment and supervision conditions. We therefore exercise plain error review, reverse imposition of conditions 36, 38, and 44, and remand to the District Court for reconsideration.

## CONCLUSION

¶75 The District Court did not abuse its discretion in precluding evidence of BB's past sexual history. Evidence of BB's past sexual history was properly precluded by § 45-5-511, MCA, and the court did not err in refusing to hold a *Mazurek* hearing or in holding the State did not open the door to such evidence. The District Court did not abuse its discretion by imposing a discovery sanction precluding Morris from presenting undisclosed evidence at trial. Morris failed to fulfill his obligation to disclose the evidence under the omnibus order and § 46-15-323(6)(c), MCA. Finally, we do not find a nexus between the crime or Morris himself and the probation conditions precluding his contact with minors. We therefore reverse the portion of the judgment imposing conditions 28, 29, 36, 38, and 44, and remand for the District Court to either strike those conditions or to impose appropriate conditions on Morris's contact with minors. Should the court reimpose appropriate conditions, they should be supported by record-based findings of a nexus between the offense and/or Morris's therapeutic needs, consider any potential threat to the community, and include a determination noting whether this nexus justifies impairing Morris's constitutional parental rights.

¶76 We affirm in part, reverse in part, and remand for further proceedings.

/S/ CORY J. SWANSON

34

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ KATHERINE M. BIDEGARAY